**SBC COMMUNICATIONS, INC., et al., Plaintiffs,**

**U.S. West Communications, Inc., Plaintiff–Intervenor,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, and United States of America, Defendants,**

**MCI Telecommunications Corp., AT & T Corporation, Association for Local Telecommunications Services, Competitive Telecommunications Association, National Cable Television Association, Sprint Communications Co. L.P., and Telecommunications Resellers Association, Defendant–Intervenors.**

No. CIV. A. 7:97–CV–163–X.

United States District Court, N.D. Texas, Wichita Falls Division.

Dec. 31, 1997.

Lonny D. Morrison, Morrison & Shelton, Wichita Falls, TX, John I. Stewart, Jr., Clifton S. Elgarten, Crowell & Moring, Washington, DC, James D. Ellis, Paul K. Mancini, SBC Communications Inc., San Antonio, TX, Donald L. Flexner, Crowell & Moring LLP, Washington, DC, Laurence H. Tribe, Jonathan S. Massey, Cambridge, MA, Liam S. Coonan, Southwestern Bell Communications Inc., Richardson, TX, Martin E. Grambow, SBC Communications Inc., Washington, DC, for plaintiffs.

Theodore C. Hirt, Carol Federighi, Carol Evans, U.S. Dept. of Justice, Civ. Div., Washington, DC, for defendants.

Keith Maydak, N. Versailles, PA, pro se.

Gregory Alan Ross, Fillmore & Purtle, Wichita Falls, TX, John D. Windhausen, Jr., Competition Policy Institute, Washington, DC, Glenn B. Manishin, Blumenfeld & Cohen, Washington, DC, Christy C. Kunin, Blemenfeld & Cohen, Washington, DC, for Competition Policy Institute amicus.

Michael Anthony Shaunessy, Bickerstaff Heath Smiley Pollan Kever & McDaniel, Austin, TX, for Newspaper Association of America amicus.

Javier Aguilar, Atty. Gen. of Texas, Austin, TX, for State of Tex. amicus.

Genice Ann Gladow Rabe, Law Office of Genice A. G. Rabe, Dallas, TX, Patrick M. Scanlon, Communication Workers of America, Washington, DC, Laurence Gold, Bredhoff & Kaiser, Washington, DC, for Communications Workers of America amicus.

Roy T. Sparkman, Sparkman & Davison, Wichita Falls, TX, Robert B. McKenna, U.S. West Communications, Denver, CO, William

T. Lake, John H. Harwood, II, W. Scott Blackmer, David G. Gray, Samir C. Jain, Wilmer Cutler & Pickering, Washington, DC, for U.S. West Communications, Inc. amicus.

Ralph M. Spory, Jr., Kelly Terry, Office of the Atty. Gen., Little Rock, AR, for State of Ark. amicus.

Robert P. Baxter, Jr., Law Office of Robert P. Baxter, Jr., Dallas, TX, Richard Clayton Trotter, Trotter Trotter & Fabrizi, Lubbock, TX, for Texas Justice Foundation amicus.

John W. Campbell, Atty. Gen. of Kansas, Topeka, KS, for Atty. Gen. of Kan. amicus.

Thomas T. Rogers, Small Craig & Werkenthin, Austin, TX, Jon Mark Hogg, Small Craig & Werkenthin, San Angelo, TX, for Texas and Southwestern Cattle Raisers Association amicus, Texas Wildlife Association amicus, Associated Milk Producers Inc. amicus, Texas Seed Trade Association amicus.

Richard Levy, Texas AFL–CIO, Austin, TX, for Texas AFL–CIO amicus.

Eva Andries, Suzi Ray McClellan, Laurie Pappas, Ricardo Guzman, Kristen Doyle, Texas Office of Public Utility Counsel, Austin, TX, for Texas Office of Public Utility Counsel amicus, Missouri Office of Public Counsel amicus, Consumer Federation of America amicus, Consumers Union amicus.

Steven NMI Baron, Atty. Gen. of Tex., Natural Resources Division, Austin, TX, for Public Utility Commission of Tex. amicus.

Oscar Morris Harrell, Michael V. Powell, Locke Purnell & Rain Harrell, Dallas, TX, Thomas F. O'Neil, III, William Single, IV, Maria Woodbridge, MCI Telecommunications Corp., Washington, DC, Donald B. Verrilli, Jr., Michelle B. Goodman, Jenner & Block, Washington, DC, for MCI Telecommunications Corp.

Oscar Morris Harrell, Michael V. Powell, Locke Purnell & Rain Harrell, Dallas, TX, David W. Carpenter, Peter D. Keisler, Sidley & Austin, Chicago, IL, Ronald D. Wells, Milner Lobel Goranson Sorrels Udashen & Wells, Dallas, TX, Mark C. Rosenblum, Marc E. Manly, AT & T Corp., Basking Ridge, NJ, for American Telephone & Telegraph Corp.

Oscar Morris Harrell, Michael V. Powell, Locke Purnell & Rain Harrell, Dallas, TX, Richard J. Metzger, Washington, DC, for Association for Local Telecommunications Services.

Oscar Morris Harrell, Michael V. Powell, Locke Purnell & Rain Harrell, Dallas, TX, Steven A. Augustino, Kelley Drye & Warren, Washington, DC, Genevieve Morelli, Competitive Telecommunications Assoc., Washington, DC, Danny E. Adams, Kelley Drye & Warren LLP, Washington, DC, for Competitive Telecommunications Association.

Oscar Morris Harrell, Michael V. Powell, Locke Purnell & Rain Harrell, Dallas, TX, Daniel L. Brenner, Neal M. Goldberg, David L. Nicoll, Washington, DC, for National Cable Television Association.

Oscar Morris Harrell, Michael V. Powell, Locke Purnell & Rain Harrell, Dallas, TX, David P. Murray, Bradford T. Hammock, Willkie Farr & Gallagher, Washington, DC, for Sprint Communications Co., L.P.

Oscar Morris Harrell, Michael V. Powell, Locke Purnell & Rain Harrell, Dallas, TX, Charles C. Hunter, Catherine M. Hannan, Hunter Communications Law Group, Washington, DC, for Telecommunications Resellers Association.

James B. Williamson, Sherrill & Pace, Wichita Falls, TX, for Bell Atlantic Corp.

Terry Dean Kernell, Mayer Brown & Platt, Houston, TX, Theodore A. Livingston, Mayer Brown & Platt, Chicago, IL, for Ameritech Corp.

## MEMORANDUM OPINION AND ORDER

KENDALL, District Judge.

· This Court has been asked to decide the constitutionality of certain provisions of the Telecommunications Act of 1996 (the "Act"). Before the Court is plaintiffs' Motion for Summary Judgment and defendants' Cross Motion for Summary Judgment. Plaintiffs [1] attack the constitutionality of Subtitle B of Title I of the Telecommunications Act of

---

**1.** Out of convenience and brevity, the Court will refer to all plaintiffs as "SBC" or "plaintiffs" including U.S. West Communications, Inc. Likewise the Court will refer to all defendants including the intervenors as "the FCC" or "defendants."

1996, codified at 47 U.S.C. §§ 271, 272, 273, 274, and 275 and entitled "Part III—Special Provisions Concerning Bell Operating Companies," on the grounds that it is (a) a violation of principles of separation of powers, (b) a bill of attainder and (c) a violation of the equal protection clause. SBC also bases its constitutional challenge of § 274 on the First Amendment to the United States Constitution.

## BACKGROUND

This case was initiated by eight Bell operating companies ("BOCs") so named and categorized because of their previous affiliation with American Telephone & Telegraph Company ("AT & T") prior to the court ordered break up of AT & T. The challenged statutes and this case have their genesis in the antitrust lawsuit brought by the United States against AT & T in 1974. This antitrust lawsuit was settled in 1982 when AT & T, an intervening defendant in this case, entered into a consent decree with the United States, the defendant here. A review of the history of that court action is appropriate.

In 1974, the Justice Department brought an antitrust lawsuit against AT & T alleging that AT & T had violated the Sherman Act by using its market power to bar entry into markets by other corporations. The lawsuit was settled through what became known as the Modified Final Judgment (the "MFJ"), which also became known as the AT & T Consent Decree. The AT & T Consent Decree required AT & T to divest itself of 24 BOCs by 1984.

The AT & T Consent Decree imposed certain restrictions on the BOCs. For decades the BOCs were under the control of AT & T until the breakup wrought by the consent decree. In their territory what are now the BOCs often had state granted franchises to provide local exchange service. The consent decree maintained the monopoly status as to local exchange service, but barred certain activities that now make their way into the "Special Provisions" found in §§ 271–275. The 1996 Act, however, took away the state sanctioned monopoly protection for local exchange service, opened all local exchange

carriers to competition, but by name singled out the BOCs so as to prevent them from engaging in long distance service, electronic publishing, and providing alarm services. In the consent decree, the BOCs were prohibited from providing telephone service between a point located inside a certain exchange area and any point outside that exchange area, which is referred to as inter local access and transport area or interLATA. The BOCs also were prohibited from providing information services, any non-telecommunications services, and from manufacturing telecommunications equipment. The prohibited information services included electronic publishing and alarm monitoring services. In 1991, the restrictions on information services were overturned and the BOCs were allowed to provide such services as electronic publishing and alarm monitoring.[2] The consent decree and its accompanying restrictions play a very important role in this case because they provide the foundation for the FCC's argument that the restrictions challenged by the plaintiffs do no more than replace the restrictions imposed by the AT & T Consent Decree. The relevancy, and imperfection, of the FCC's argument is revealed through further analysis of the parties' arguments and the challenged statutes.

## CHALLENGED PROVISIONS

On February 8, 1996, the President signed the Telecommunications Act of 1996 into law. Section 601(a)(1) of the Act expressly provided that the restrictions imposed by the AT & T Consent Decree would be replaced by the restrictions and obligations of the Act. The Act serves to open local exchanges to competition by imposing various obligations on local exchange carriers including the requirement that incumbent local exchange carriers assist competitors desiring to use their networks, and allow them to do so. Section 251(b) of the Act places numerous and onerous duties on all local exchange carriers designed to stimulate competition in and simplify entry into the local markets by the competitors of all local exchange carriers. Section 252 provides the guidelines for achieving certain of

---

**2.** *United States v. Western Electric Co., Inc.,* 767 F.Supp. 308 (D.D.C.1991), *aff'd,* 993 F.2d 1572 (D.C.Cir.), *cert. denied,* 510 U.S. 984, 114 S.Ct. 487, 126 L.Ed.2d 438 (1993).

the duties imposed on the local exchange carriers by § 251.

Local telephone companies such as the plaintiffs are commonly referred to as local exchange carriers. Local exchange carriers provide various services including local telephone calls, short-haul calls, operator services, and advanced features such as call waiting, call forwarding and voice mail. Additionally, they provide exchange access services, which enable long distance carriers to use the local exchange carriers' facilities to originate and terminate long distance calls to end users.

Plaintiffs are not the only local exchange carriers. Hundreds of other local exchange carriers operate in the United States. GTE Corporation, Sprint Corporation, Frontier Corporation, Cincinnati Bell Telephone Company, and Southern New England Telephone Company are a few examples of significant sized local exchange carriers completely unaffiliated with the Bell operating companies.

The effect of the Telecommunications Act of 1996 is to expose incumbent local exchange carriers to competition through the elimination of any previous barriers to competition created by local laws or naturally arising from the local exchange carrier's exclusive control over their property. These restrictions are not the subject of the constitutional challenge brought by the plaintiffs in this Court. Instead, the plaintiffs are challenging the restrictions found in §§ 271–275 of the Act entitled "Special Provisions Concerning Bell Operating Companies." Plaintiffs argue it is not lawful or fair to take away the state sanctioned franchised protected status for local service while at the same time continuing to not allow only them to compete in other telephone business, particularly long distance. They contend that the proverbial carrot has been removed but they are still receiving the stick.

The Special Provisions found in §§ 271–275 apply solely to a BOC or any affiliate of a BOC. That term is defined in § 153(4) as twenty specific corporate entities [3] and their successors or assigns that provide wireline telephone exchange service. 47 U.S.C. § 153(4). As such the statutes in question are not laws of general application. SBC challenges § 271, which restricts the BOCs' entry into the long distance market, and § 274, which prohibits electronic publishing by BOCs through the use of basic telephone service for a period of four years. SBC also attacks the requirement of affiliates for particular lines of business and the restrictions against manufacturing and the provision of alarm monitoring services found in §§ 272, 273 and 275.

Section 271 prohibits a BOC from providing interLATA services unless the following requirements are met:

(A) Presence of a facilities-based competitor

A Bell operating company meets the requirements of this subparagraph if it has entered into one or more binding agreements that have been approved under section 252 of this title specifying the terms and conditions under which the Bell operating company is providing access and interconnection to its network facilities for the network facilities of one or more unaffiliated competing providers of telephone exchange service (as defined in section 153(47)(A) of this title, but excluding exchange access) to residential and business subscribers. For the purpose of this subparagraph, such telephone exchange service may be offered by such competing providers either exclusively over their own telephone exchange service facilities or predominantly over their own telephone exchange service facilities in combination

---

**3.** Section 153(4)(A) identifies the following as Bell operating companies: Bell Telephone Company of Nevada, Illinois Bell Telephone Company, Indiana Bell Telephone Company, Incorporated, Michigan Bell Telephone Company, New England Telephone and Telegraph Company, New Jersey Bell Telephone Company, New York Telephone Company, U.S. West Communications Company, South Central Bell Telephone Company, Southern Bell Telephone and Telegraph Company, Southwestern Bell Telephone Company, The Bell Telephone Company of Pennsylvania, The Chesapeake and Potomac Telephone Company, The Chesapeake and Potomac Telephone Company of Maryland, The Chesapeake and Potomac Telephone Company of Virginia, The Chesapeake and Potomac Telephone Company of West Virginia, The Diamond State Telephone Company, the Ohio Bell Telephone Company, the Pacific Telephone and Telegraph Company and Wisconsin Telephone Company.

with the resale of the telecommunications services of another carrier. For the purposes of this subparagraph, services provided pursuant to subpart K of part 22 of the Commission's regulations (47 C.F.R. 22.901 et seq.) shall not be considered to be telephone exchange services.

(B) Failure to request access

A Bell operating company meets the requirements of this subparagraph if, after 10 months after February 8, 1996, no such provider has requested the access and interconnection described in subparagraph (A) before the date which is 3 months before the date the company makes its application under subsection (d)(1) of this section, and a statement of the terms and conditions that the company generally offers to provide such access and interconnection has been approved or permitted to take effect by the State commission under section 252(f) of this title. For purposes of this subparagraph, a Bell operating company shall be considered not to have received any request for access and interconnection if the State commission of such State certifies that the only provider or providers making such a request have (i) failed to negotiate in good faith as required by section 252 of this title, or (ii) violated the terms of an agreement approved under section 252 of this title by the provider's failure to comply, within a reasonable period of time, with the implementation schedule contained in such agreement.

47 U.S.C. § 271(c)(1)(A) and (B).

Additionally, the BOCs must satisfy what Congress has termed a "Competitive checklist," which contains fourteen requirements governing the BOCs' access and interconnection provided to other telecommunications carriers. Upon compliance with these prerequisites, the BOC is not done. Section 271(d) provides that a BOC then may apply with the Federal Communications Commission for authorization to provide interLATA services. 47 U.S.C. § 271(d)(1). Under § 271, the FCC is restricted from granting such authorization unless the BOC has met the requirements identified above in (c)(1)(A) or (B); the authorization is in accordance with § 272; and "the requested authorization is consistent with the public interest, convenience, and necessity." Of course, this last

hoop to jump through is met when the FCC says it is met.

Section 272 requires the BOCs to establish a separate affiliate for manufacturing activities that are authorized by the FCC under § 271(d); for origination of interLATA telecommunications services other than certain interLATA services, out-of-region services, previously authorized activities; and interLATA information services forbidden by §§ 271 and 273 of the Act. Section 273 prohibits the BOCs from manufacturing and providing telecommunications equipment for as long as they are prohibited from providing long distance services under § 271.

Section 274 prohibits the BOCs for a period of four years from February 8, 1996 from engaging in electronic publishing through use of its basic telephone service. "Electronic publishing" is defined as "the dissemination, provision, publication, or sale to an unaffiliated entity or persons, of any one or more of the following: news (including sports); entertainment (other than interactive games); business, financial, legal, consumer, or credit materials; editorials, columns, or features; advertising; photos or images; archival or research material; legal notices or public records; scientific, educational, instructional, technical, professional, trade, or other literary materials; or other like or similar information." 47 U.S.C. § 274(h). Finally, § 275 forbids the BOCs from engaging in alarm monitoring services for a period of five years from February 8, 1996.

## DISCUSSION—BILL OF ATTAINDER

The Court first addresses SBC's argument that the Special Provisions constitute a bill of attainder. The defendant and intervenors contend that the Special Provisions are appropriate regulation, not legislative punishment as required to constitute an attainder. This is of course a judgment call based on the law and all the surrounding factual circumstances. Whether the legislation goes too far and punishes the legislative target (here the named BOCs only) is the very type of question that judicial review must answer. Judicial review of the constitutionality of an Act of Congress is indeed the gravest and most delicate duty that an Article III judge

is called on to perform. *Blodgett v. Holden*, 275 U.S. 142, 48 S.Ct. 105, 72 L.Ed. 206 (1927) (Holmes, J., concurring). However, such decisions are the judiciary's duty under our system of government.

 SBC strongly urges that the singling out of specific corporations by name and burdening those corporations with such limitations as those created by §§ 271–275 necessarily constitutes a bill of attainder in violation of Article I, § 9, Clause 3, of the Constitution.[4] Although the Supreme Court has established criteria for determining whether a particular statute constitutes a bill of attainder, the Supreme Court has never addressed the precise issue before this Court: whether Congress may enact laws that single out by name specific business entities and restrict their ability to conduct lawful business, and do not do so for other similarly situated entities.[5]

 A bill of attainder has been defined as "a legislative act which inflicts punishment without a judicial trial." *Cummings v. State of Missouri*, 71 U.S. 277, 323 (4 Wall.), 18 L.Ed. 356 (1866). A bill of attainder originally was associated with legislation that sentenced a named individual to death. However, Article I, § 9 also proscribes laws characterized as bills of pains and penalties, which inflict a punishment less than death. *United States v. Lovett*, 106 Ct.Cl. 856, 328 U.S. 303, 315, 66 S.Ct. 1073, 1078–79, 90 L.Ed. 1252 (1946) *citing Cummings*, 71 U.S. 277, 4 Wall. 277. As the Supreme Court has instructed, the Bill of Attainder Clause was intended to implement the separation of powers as well as reflect "the Framers' [of the Constitution] belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific

4. The Court will address briefly at this point a related argument, preliminary in nature and raised by the FCC, that the Bill of Attainder Clause does not apply to corporations. While it is true that not all constitutional rights afforded individuals are guaranteed to corporations, corporations enjoy most of the same constitutional guarantees as individuals, even those provisions that would appear inherently personal in nature. *See Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (corporation has a First Amendment right to freedom of speech); *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (corporation's property may not be seized without just compensation); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (corporation may not be subjected to unreasonable searches and seizures); *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977) (corporation can plead former jeopardy); *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (corporation is entitled to due process); *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985) (corporation is entitled to equal protection). Whether a constitutional right is available to corporations "depends on the nature, history, and purpose of the particular constitutional provision." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 778 n. 14, 98 S.Ct. 1407, 1416 n. 14, 55 L.Ed.2d 707 (1978) (emphasis added).

The Court agrees with the plaintiffs that the protections afforded by the Bill of Attainder

Clause apply to corporations. The nature of the Clause is not inherently personal. It is not difficult to see that corporations, like individuals, may find themselves at the mercy of a legislature attempting to assume the role of the judiciary. As the Supreme Court stated in *United States v. Brown*, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965), "the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function or more simply—trial by legislature." 381 U.S. at 440, 85 S.Ct. at 1710.

It is well settled that corporations are subject to criminal law. They are often indicted, tried, convicted and sentenced under the Sentencing Guidelines. Given that a bill of attainder is trial by legislature, with penal consequences, the Court can think of no reason why the clause should be read so narrowly to exclude corporations.

5. SBC took the position and Congress was informed as early as May 21, 1992 that legislation that singled out the BOCs alone for special disability violated separation of powers principles and specifically the Bill of Attainder Clause, Article I, § 9 of the Constitution. This opinion was expressed by Professor Laurence H. Tribe, probably the most respected Constitutional law scholar alive. See Laurence H. Tribe, *Comments on The Brooks Bill (H.R. 5096)—A Constitutional Perspective*, May 21, 1992, also made a part of the record in this case.

persons." *Brown*, 381 U.S. at 445, 85 S.Ct. at 1713.

Although historically the gamut of statutes and corresponding punishments deemed forbidden as bills of attainder has been limited, the list of punishments has broadened somewhat. In addition to the traditional legislative punishments considered unconstitutional—imprisonment, banishment, and confiscation of property—statutes preventing select individuals or groups from engaging in specified employments or vocations have been added to the list of impermissible sanctions. *Nixon v. Administrator of General Services*, 433 U.S. 425, 474, 97 S.Ct. 2777, 2806, 53 L.Ed.2d 867 (1977).

A review of Supreme Court precedent demonstrates that the Court rarely has held a statute to be unconstitutional as a bill of attainder. The defendants' argue that this fact militates against a finding that the questioned statutes are bills of attainder. However, the statutes and punishment before this Court are extraordinary, and in fact unprecedented. An analysis under the applicable standards for a bill of attainder show that this is clearly what the statutes are. The fact that such a court finding is rare is because it is rare for Congress to in essence declare by name someone guilty of an offense (here antitrust violations) and then set about to punish them by statute.

■ A statute is considered an unconstitutional bill of attainder when it (1) identifies a specific individual or group (2) inflicts punishment on that individual or group (3) without the benefit of a judicial trial. *Selective Serv. Sys. v. Minnesota Public Interest Research Group*, 468 U.S. 841, 846, 104 S.Ct. 3348, 3351–52, 82 L.Ed.2d 632 (1984). The parties do not, and cannot, dispute that the specification element is met. The Special Provisions by their very terms apply solely to the BOCs. Nor have the BOCs had any judicial trial for crimes they have committed or may commit. Thus, the real dispute centers on the issue of whether the company specific prohibitions found in §§ 271–275 constitute punishment for purposes of a bill of attainder, or, as the defendants contend, they are merely economic regulation.

■ The Supreme Court applies a three-step analysis in determining whether a law crosses the boundary between lawful regulation and impermissible punishment and, therefore, is deemed a bill of attainder. The first step to making this determination is known as the historical test and involves a comparison of the punishment at hand to the type of sanctions historically found to constitute legislative punishment. *Nixon*, 433 U.S. at 475, 97 S.Ct. at 2806–07. SBC argues that Supreme Court precedent holding unconstitutional laws prohibiting individuals or groups from engaging in a particular profession apply equally to this case. The FCC urges that none of the circumstances present in the cases where the Supreme Court has found a law to be a bill of attainder are present in the case at hand. The FCC does not equate an individual's deprivation of his employment to the outlawing of participation in lawful business placed on SBC through the Special Provisions. In fact, the FCC urges this Court to find that the Special Provisions are not punitive because they merely replace the restrictions and conditions imposed on the BOCs under the Consent Decree, between AT & T and the United States, related court orders and administrative regulations which arose out of the antitrust litigation against AT & T.

Although the history of the Clause suggests that individuals have benefitted from the Bill of Attainder Clause, the Supreme Court has long stated that the clause applies to individual persons *and private groups*. *See e.g. Cummings*, 71 U.S. 277, 4 Wall. 277 (emphasis added—*See also* footnote 5 on this point). To glean from this language an intent of the Supreme Court to apply the protections afforded under the Bill of Attainder Clause to a broader group than just individuals is wholly consistent with the purpose of the Clause. The Supreme Court has stated that the Bill of Attainder Clause is "not to be given a narrow historical reading," rather, it is "to be read in light of the evil the Framers had sought to bar: legislative punishment, of any form or severity, of specifically designated persons or groups." *Brown*, 381 U.S. at 447, 85 S.Ct. at 1714.

■ Further, the list of unlawful Congressional sanctions is not limited solely to deprivations of life, liberty and property. *Cum-*

*mings,* 71 U.S. at 320. In *Cummings,* the Supreme Court recognized the unlimited scope of punishments prohibited by the Bill of Attainder Clause stating:

> The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact. Disqualification from office may be punishment, as in cases of conviction upon impeachment. Disqualification from the pursuits of a lawful avocation, or from positions of trust, or from the privilege of appearing in the courts, or acting as an executor, administrator, or guardian, may also, and often has been, imposed as punishment.

71 U.S. at 320. The Supreme Court in *Nixon* again echoed this sentiment when it stated that "[o]ur treatment of the scope of the Clause has never precluded the possibility that new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee." *Nixon,* 433 U.S. at 475, 97 S.Ct. at 2806.

 Under a historical analysis, the burdens imposed on the BOCs by §§ 271–275 necessarily constitute punishment. Historically, the Supreme Court has forbidden legislation preventing individuals or groups from engaging in a profession or business as well as those laws that deprive them of rights previously enjoyed. The Special Provisions prevent the BOCs from engaging in a lawful business for what the Court only can conclude were the sins of the parent, AT & T, or for what offenses Congress believes the BOCs may (without any evidence) commit in the future. This Court is not deterred by the fact that named business entities, not named individuals, are subjected to the sanctions imposed by the Special Provisions. Corporations, like individuals, are subject to punishment as has long been evidenced by the criminal laws of this country.

Sections 271–275 fail to set forth a generally applicable rule requiring all local exchange carriers to comply with their restrictions. *See Brown,* 381 U.S. at 446, 85 S.Ct. at 1713. The Special Provisions impose no slight burden on the BOCs as the FCC urges this Court to believe. Sections 271–275 foreclose the BOCs from immediate entry into very lucrative markets at a time when the telecommunications market is ever expanding and changing. The barriers to entry in the long-distance and alarm monitoring services markets, the manufacturing restrictions, and the prohibitions against electronic publishing prescribed by §§ 271–275 constitute punishment as that term is applied to a bill of attainder.

To put the BOCs' plight in perspective, all other telecommunications carriers, including all other non specified similarly situated local exchange carriers, may offer any of the services forbidden to the BOCs. This allows other telecommunications carriers that are in competition with the BOCs to offer "one-stop shopping" for customers' needs. No longer will consumers need to purchase local service through one carrier and long distance through another carrier. The inability of the BOCs to provide their customers with all of their telecommunications needs greatly increases the likelihood of enormous losses of existing business in addition to the economic losses the BOCs will suffer by their inability to enter various telecommunications markets. While the sanctions imposed by the Special Provisions do not result in imprisonment or banishment of the BOCs, they punish the BOCs in the only manner possible for a corporation—financially.[6]

 Indeed, §§ 271–275 presume the guilt of the BOCs as monopolists and assess the punishment without the benefit of a judicial trial. The Bill of Attainder Clause was designed to safeguard against this very conduct—trial by legislature. *Brown,* 381 U.S. at 442, 85 S.Ct. at 1711–12. While Congress may prescribe general rules governing society, it is the function of the judiciary to apply those rules. *Id.* at 446, 85 S.Ct. at 1713 *citing Fletcher v. Peck,* 10 U.S. 87, (6 Cranch) 3 L.Ed. 162 (1810). Through the Special Provisions, Congress has encroached on the authority of the judiciary by applying the general rules prescribed in §§ 251–252

---

6. How does one punish a corporation? You cannot tie it to the whipping post or roll the corporate charter up and place it in jail. The only way you ever punish a corporation is by affecting its bottom line and that is precisely what §§ 271–275 do to the named BOCs.

and then adjudging the BOCs guilty of non-compliance, guilty of anticompetitive conduct, and assessing their punishment to be foreclosure of various lucrative and legal business activities otherwise available to all other telecommunications carriers.

The FCC argues that the restrictions imposed by the Special Provisions institute no additional restrictions than those imposed on the BOCs by the AT & T Consent Decree. According to the FCC, §§ 271–275 "merely revamp" the restrictions on the BOCs and their affiliates imposed by the consent decree and "move it from the judicial and executive realm to the legislative realm." Therein lies the imperfection of their argument. The Bill of Attainder Clause is designed to implement separation of powers and to prevent this very conduct that the FCC contends validates Congress' enactment of the Special Provisions. While a court can adjudicate the rights or liabilities of the BOCs and impose corresponding sanctions—or formulate a consent decree as in the case of AT & T—Congress has not been granted such authority. Furthermore, even a court may only do so after notice, evidence, confrontation and finally an adjudication by a politically neutral judge or jury.

Additionally, the Special Provisions take from the BOCs certain rights previously enjoyed—a historically impermissible sanction. *See Cummings,* 71 U.S. at 320. True, the BOCs were subject to restrictions under the consent decree, including access to the long distance market. However, a number of the restrictions imposed on the BOCs through the consent decree were eliminated years before the enactment of the Act including the information services ban, which encompassed both alarm monitoring and electronic publishing. Although once liberated from these restrictions, Congress has reinstated them solely against the BOCs through the Special Provisions.

The FCC suggests that the Special Provisions cannot be punitive because they are not permanent or inescapable. In support of its contention, the FCC cites *Selective Service Sys. v. Minnesota Public Interest Research Group,* 468 U.S. 841, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984), which addressed the constitutionality of § 12(f) of the Military Selective Service Act. The challenged statute in

that case denied any form of assistance provided under Title IV of the Higher Education Act to those men who failed to register for the draft as required by the Military Selective Service Act. *Id.* at 844, 104 S.Ct. at 3350–51. However, the statute allowed those failing to timely register to qualify for aid by filing late. *Id.* at 850, 104 S.Ct. at 3353–54. The Supreme Court held that the statute was not a bill of attainder stating: "[a] statute that leaves open perpetually the possibility of qualifying for aid does not fall within the historical meaning of forbidden legislative punishment." *Id.* at 853, 104 S.Ct. at 3355.

This Court is not persuaded that the Supreme Court's decision in *Selective Service* signifies that the constitutionality of a statute under the Bill of Attainder Clause will be dependent on the inclusion or exclusion of an escape clause. To the contrary, the Court in *Brown* noted that an escape clause is not an "absolute prerequisite to a finding of attainder." 381 U.S. at 458 n. 32, 85 S.Ct. at 1720 n. 32. The Court further stated that "[s]uch an absolute rule would have flown in the face of explicit precedent." *Id.* Moreover, the challenged statute in *Selective Service* potentially deprived male citizens, *all male citizens,* in the appropriate age range of government benefits—not their ability to participate in particular employment or business, as here. The Supreme Court recognized this distinction stating: " 'the sanction is the mere denial of a noncontractual governmental benefit. No affirmative disability or restraint is imposed.' " *Selective Service,* 468 U.S. at 853, 104 S.Ct. at 3355 *citing Flemming v. Nestor,* 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960).

The Special Provisions impose affirmative disabilities on the BOCs. The "Competitive checklist" identifies fourteen duties alone. Sections 271–275 strip the BOCs of their ability to enter new markets and tie their hands while their competitors such as GTE, AT & T, and MCI take their punches. These provisions impose burdensome requirements that must be met before the BOCs even can request to compete with other telecommunications carriers in long distance, alarm monitoring services, manufacturing, and electronic publishing. But

perhaps most significantly, it is conceivable that these requirements may never be met by the BOCs. Not only is the "Competitive checklist" in § 271 extremely onerous, the process for applying to have the numerous restrictions removed is tainted with indefiniteness and replete with arbitrary standards.

Although §§ 271–275 constitute a bill of attainder under the historical analysis, the punitive nature of the Special Provisions is reinforced through an application of the functional test enunciated by the Supreme Court. The functional test involves "analyzing whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Nixon,* 433 U.S. at 475, 97 S.Ct. at 2806–07. "Where such legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers." *Id.*

The FCC identifies the otherwise nonpunitive purposes of the Special Provisions as "establishing telecommunications policy, increasing competition in markets to benefit the consumer, preventing anticompetitive activities." Preventing anticompetitive activities necessarily implies that if the restrictions imposed by the Special Provisions were lifted, the BOCs would engage in anticompetitive conduct. Once again, the Special Provisions presume the BOCs' guilt. If establishing the telecommunications market and increasing competition were the goals of Congress, those ends have been addressed through other provisions of the Act such as § 251, which applies generally to all telecommunications carriers, and more specifically to *all* local exchange carriers.

The functional reality of the Special Provisions is that they serve as punishment for the BOCs' presumed anticompetitive conduct. Congress independently has adjudicated the BOCs guilty of antitrust violations. Moreover, Congress has determined that the BOCs are guilty of an unlawful monopolization of the long distance market before the BOCs even have entered that market. The evils that Congress is predicting and attempting to prevent amply are addressed by the antitrust laws of this country if and when their use becomes necessary. And if they do they will be applied in a court of law.

The FCC further urges that the restrictions found in the Special Provisions were not intended to punish prior bad behavior of the BOCs, but are based "on a realistic appraisal of the incentives" of the BOCs to disadvantage competitors. In essence the argument is that "maybe they weren't criminals in the past but we know they will be in the future." Punishment is not restricted to past deeds. *Brown,* 381 U.S. at 458–59, 85 S.Ct. at 1720–21. Impermissible sanctions may include deprivations designed to prevent future misconduct. *Id.* Thus, that Congress is basing its restrictions in §§ 271–275 on a "predictive determination" offers no salvation for the FCC's argument. If anything it helps make the case for the restrictions being a bill of attainder.

The final test for determining whether a statute constitutes a bill of attainder is the motivational test, which inquires into "whether the legislative record evinces a congressional intent to punish." *Nixon,* 433 U.S. at 478, 97 S.Ct. at 2808. Although an explicit demonstration of punitive legislative intent is unnecessary to a bill of attainder, the Supreme Court has turned to the legislative history of challenged statutes as some evidence in analyzing their constitutionality. *Nixon,* 433 U.S. at 480, 97 S.Ct. at 2809. The references to the AT & T Consent Decree and the alleged antitrust violations of AT & T are not so innocent as the FCC urges this Court to believe. Indeed, the consent decree was born out of alleged antitrust violations by AT & T. The result of their alleged unlawful conduct was the numerous restrictions imposed by the decree. Those same restrictions are imposed now on the BOCs through the Special Provisions. AT & T's prior allegedly anticompetitive conduct forms the very basis of the Special Provisions. The Court can reach no other conclusion than that Congress intended §§ 271–275 to punish the BOCs for their former parent AT & T's transgressions over two decades ago or for crimes yet to be committed by the BOCs.

## CONCLUSION

Sections 271–275 of the Telecommunications Act of 1996 constitute a bill of attainder and thus are unconstitutional. If the sections were statutes of general applicability this Court's ruling would be different. Having so found the Court need not and does not reach the plaintiffs' equal protection and first amendment arguments. The plaintiffs' Motion for Summary Judgment is **GRANTED** and the defendants' Cross–Motion for Summary Judgment is **DENIED**.

SO ORDERED.